Ebbert, Appellant, *v.* Plymouth Oil Company et al.

Argued October 1, 1943. Before Maxey, C. J., Drew, Linn, Stern, Patterson and Stearne, JJ.

*Earl F. Reed,* with him *Charles M. Thorp, Jr.,* of *Thorp, Bostwick, Reed & Armstrong, Drayton Heard,* of *Heard & Heard,* and *J. Roland Johnston,* for appellant.

*Elder W. Marshall,* with him *John O. Wicks,* of *Weller, Wicks & Wallace, Fred O. Blue,* of *Blue, Dayton & Campbell, Reed, Smith, Shaw & McClay,* and *T. W. Pomeroy, Jr.,* for appellees.

OPINION BY MR. JUSTICE HORACE STERN, November 22, 1943:

The story of this litigation begins in 1925. In that year a stockholders' bill was filed in the Court of Chancery of the State of Delaware against Plymouth Oil Company and thirty-one individual defendants. Among the plaintiffs was William M. Henderson, acting in part for the present plaintiff, Sara F. Ebbert, whose stock was then held in his name. The bill alleged that the individual defendants therein named, organizers and promoters of Plymouth Oil Company, had illegally and fraudulently acquired 700,000 shares of the company's stock. The prayer was for cancellation of this stock, the compulsory election of a new board of directors, and the appointment of receivers. The case was decided by the Delaware court in 1928 in favor of the defendants and the bill was dismissed.

At various times, beginning July 31, 1925, and ending November 30, 1929, Plymouth Oil Company made payments out of its corporate treasury, in connection with this Delaware litigation, of sums aggregating $787,500 for counsel fees and $45,646.36 for other expenses, a total of $833,146.36.[1] Sara F. Ebbert, owner of 600

---

[1] Plaintiff claims that part of this sum was in payment of fees for services rendered by counsel in a suit brought by Henderson in the United States District Court for the Western District of Pennsylvania against Plymouth Oil Company to compel the transfer to him of certain stock standing in the name of J. G. Farquhar, who subsequently was made a defendant in the proceeding. The evidence did not support this claim, and the court found to the contrary.

shares of the company's stock, filed the present bill in equity against the company and nine individuals, of whom Michael Benedum, Trees, Huston, Hallanan, Holliday, Dally and Davenport were defendants in the Delaware suit, all of these except Davenport having been promoters of the corporation, and Michael Benedum, Huston, Holliday, Hallanan and Davenport having been members of the board of directors when the payments were made; Jones, Trees, Dally and Paul Benedum became members of the board at a later period. The bill alleges that practically all the payments for counsel fees and expenses were for the benefit of the individual defendants in the Delaware and Farquhar [2] proceedings and therefore constituted an unlawful diversion of corporate funds. It further alleges that this sum of $833,-146.36 was included in assets, under the designation "Deferred Charges," in the consolidated balance sheets contained in the annual reports submitted to the stockholders for the years 1930 to 1937 inclusive, that this constituted a representation that it was a collectible claim against the individual defendants in the Delaware and Farquhar suits, and that it was not removed as an asset until 1938, when it was charged off against the earned surplus of the corporation. Defendants are accused of having been "negligent in the performance of their offices" in that they failed to take any action to recover this money. It is further stated that plaintiff made no demand on the board of directors to remedy the wrongs complained of for the reason that "it would be futile and useless to do so." The bill prays an accounting to the corporation for the losses which it suffered.

Defendants filed preliminary objections, which the court sustained, and the bill was dismissed on the ground that it showed on its face the action was barred by laches and the statute of limitations. On appeal to this court the action of the lower court was reversed with a procedendo (*Ebbert v. Plymouth Oil Co.*, 338 Pa. 272, 13

---

[2] See note 1.

A. 2d 42) because the designation "Deferred Charges" apparently amounted to a concealment which relieved plaintiff, until the amount was charged against surplus, from the duty of inquiring as to its true nature. The case being remanded for trial, hearing was had and, on the basis of the testimony taken, the court below found that there was not in fact any fraudulent concealment by defendants of the making of the payments; accordingly the bill was again dismissed for the same reason as before.

While this suit is brought by a shareholder it is one in which relief is sought for the benefit of the corporation, whose rights plaintiff is derivatively asserting because of the board's failure to act. It should be noted at the outset that the case as now presented is wholly different from what it was when the bill was attacked on demurrer. We now have facts found by the court instead of the mere averments of a pleading.

Naturally the basic issue is whether, as defendants contend, the payments for counsel fees and expenses in the Delaware suit were justified because the company was obliged to defend the action in order to protect its vital interests, or whether, as plaintiff claims, those interests were nominal and the individual defendants, as the parties really involved, should have borne all but a negligible part of the cost. If, however, the court below was correct in dismissing the bill because of plaintiff's delay in instituting the action it will be unnecessary to decide whether the expenditures were for a lawful corporate purpose or whether they constituted a fraudulent diversion of the company's funds.

The latest of the payments for which restitution is sought was made November 30, 1929, and the present action was begun September 26, 1938, that is, after a lapse of approximately nine years. The Act of March 28, 1867, P. L. 48, provides that "no suit, at law *or in equity*, shall be brought or maintained against any . . . director in any corporation . . . to charge him . . .

with any *neglect of duty* as such . . . director, except within six years after . . . the commission of such act of negligence by such . . . director." In *Link v. McLeod,* 194 Pa. 566, 45 A. 340, the directors of a corporation passed an illegal resolution making an appropriation of corporate funds to the president, and payment thereunder was accordingly made. A bill in equity having been brought against the directors for an accounting, with the company named as a party defendant, it was held that the Act of 1867 barred the action, which was instituted more than six years after the passage of the resolution. It was apparently assumed that, although the passage of the resolution and the payment of the money were both wilful rather than negligent acts, they constituted a *neglect of duty* within the meaning of the statute. Accepting that case as a precedent, it would follow that the Act of 1867 is applicable to the present proceedings. But in any event, and even if there is no statute of limitations which in terms governs this action, it is well established that equity will frequently adopt and apply the statute of limitations which controls analogous proceedings at law: *Dalzell v. Lewis,* 252 Pa. 283, 287, 97 A. 407, 408; *Bailey v. Jacobs,* 325 Pa. 187, 195 n. 5, 189 A. 320, 325 n. 5; *Bell, Secretary of Banking, v. Brady,* 346 Pa. 666, 668, 31 A. 2d 547, 549. This is especially, if not invariably, true if the cause of action is not exclusively cognizable in equity (34 Amer. Jur. 55, sec. 59), which is the situation here, because, where an accounting is desired, it may be obtained in a common-law proceeding, the practice being outlined in sections 11 and 19 of the Act of May 14, 1915, P. L. 483 (amended by Act of May 26, 1937, P. L. 895); *Shaw v. Newingham,* 279 Pa. 180, 182, 183, 123 A. 783, 784; *Williams v. Finlaw, Mueller & Co.,* 292 Pa. 244, 247, 141 A. 47, 48. Equity takes jurisdiction (under the Act of October 13, 1840, P. L. 1, sec. 19) only when the accounts are mutual or complicated, or when discovery is needed and is material to the relief: *Gloninger v. Hazard,* 42

Pa. 389, 401; *Holland v. Hallahan,* 211 Pa. 223, 60 A.
735; *Williams v. Finlaw, Mueller & Co.,* 292 Pa. 244,
141 A. 47.[3] Because of this concurrent jurisdiction the
statute of limitations is generally held to be a bar to pro-
ceedings in equity for an accounting when it would be a
bar to an action at common law for the same matter:
*Bank of the United States v. Biddle and Andrews,* 2 Pars.
Eq. *31, *46; *Hamilton v. Hamilton's Executors,* 18 Pa.
20; *McKelvy's Appeal,* 72 Pa. 409, 413; *Bickel's Appeal,*
86 Pa. 204, 213; *Miller v. Fulton,* 206 Pa. 595, 599, 56 A.
74, 75; 34 Am. Jur. 81, sec. 99. The action for an account-
ing at law being on the same plane, in practice, as an ac-
tion in assumpsit (*Miller v. Belmont Packing & Rubber
Co.,* 268 Pa. 51, 64, 110 A. 802, 806; *Duggan v. Duggan,*
291 Pa. 556, 560, 140 A. 342, 344) is subject to the same
six-year limitation: *Guldin v. Lorah,* 141 Pa. 109, 21 A.
504; *Miller v. Fulton,* 206 Pa. 595, 599, 56 A. 74, 75; *Bor-
land's Appeal,* 234 Pa. 280, 286, 287, 83 A. 110, 112. From
all of which it follows that, whether we consider the Act
of 1867 applicable to the present proceedings ex proprio
vigore, or that a six-year limitation should be adopted by
way of analogy to proceedings at law (especially be-
cause of the concurrent jurisdiction of law and equity
in proceedings for an accounting), the result is the same,
leaving as the only remaining question, when did the
statute begin to run?

At the latest, in the absence of any circumstances
modifying the general rule, the statute started to operate
at the time of the allegedly unlawful diversion of the
company's funds.[4] It is the breach of duty which gives

---

[3] Because the present action is brought by a stockholder, due to
the failure of the directors to act, the proceeding is necessarily in
equity; the company itself, for which the relief is sought, might have
proceeded at law.

[4] In *Link v. McLeod,* 194 Pa. 566, 45 A. 340, it was held that the
statute began to run not merely from the time the money was paid,
but from the time the resolution was passed making the appropriation.

rise to the cause of action, and the statute runs from the date of such breach: *Guarantee Trust & Safe Deposit Co. v. Farmers' & Mechanics' National Bank,* 202 Pa. 94, 51 A. 765; *Plazak v. Allegheny Steel Co.,* 324 Pa. 422, 429, 188 A. 130, 133; *McNeely v. Philadelphia National Bank,* 314 Pa. 334, 342, 343, 172 A. 111, 114. Plaintiff advances the ingenious theory that after the money was paid out it became the duty of the directors to sue to recover it, that their failure to do so was negligence which constituted a basis of liability distinct from the original diversion of funds, and that as to such negligence the statute of limitations began to run only when the claims were outlawed by reason of the failure to pursue them, which would be six years after the money was taken from the corporate treasury. In support of this proposition plaintiff cites authorities to the effect that the failure of a board of directors to collect accounts due the corporation is an actionable wrong. But those were cases in which the claims were against third persons and not against the directors themselves, in which latter event it would seem too clear for discussion that to the wrong of paying out the money cannot be added a second wrong of not suing themselves to recover it within six years, thereby extending the six to a twelve-year statute of limitations. Here the company had no cause of action against any of the thirty-one defendants in the Delaware litigation other than its own directors who paid out its money, even though these others benefited by the voluntary payments made by the company in relief of their liability for the counsel fees and expenses. Moreover, even were it conceded that the directors were guilty of any such actionable negligence apart from their alleged wilful wrongdoing, the statute of limitations would have started to run in that regard, not from the time when the original claims against them became outlawed, but when their duty to seek recovery of the money began (*Wilcox v. Plummer,* 4 Pet. (29 U. S.) *172, *183; *Rhines v. Evans,* 66 Pa. 192, 194, 195; *Guarantee Trust*

& *Safe Deposit Co. v. Farmers' & Mechanics' National Bank,* 202 Pa. 94, 97, 98, 51 A. 765, 766) which would have been immediately after the payments were made, so that even if plaintiff's theory were accepted it would not have the effect of extending the statutory period of limitation beyond the six years following the appropriation of the company's funds. As to those defendants who *subsequently* became members of the board, they cannot be held responsible for failure to take action, since they were only a minority and plaintiff herself admits that it would have been useless to try to get the majority directors to remedy the alleged wrong. A director is not responsible for anything that happened in the corporation before he became a member of the board unless he subsequently ratifies and becomes a party to the wrongdoing, or attempts to conceal it from the shareholders, or unless action on his part would be effective to repair the wrong: see *Lifshutz v. Adams,* 285 N. Y. 180, 185, 33 N. E.2d 83, 85.

Having thus concluded that the six-year limitation presumably started to run in this case no later than November 30, 1929, when the last payment was made out of the corporate treasury, and the present proceeding not having been instituted until September 26, 1938, it follows that the suit is barred unless plaintiff was excused from prompter action by reason of circumstances serving to postpone the operation of the statute. On the previous appeal to this court such a circumstance was found to exist in the use of the designation "Deferred Charges" in the balance sheets circulated among the stockholders, it being considered that this might have misled plaintiff in regard to the nature of the items thus referred to. Of course, if, in addition to the commission of an initial wrong, the wrongdoer is guilty of some act of concealment or deception, the running of the statute does not begin until discovery, or when there might have been discovery had reasonable diligence been exercised: *Smith v. Blachley,* 198 Pa. 173, 47 A. 985; *Deemer v. Weaver,*

324 Pa. 85, 187 A. 215; *Bailey v. Jacobs,* 325 Pa. 187, 201, 206, 189 A. 320, 327, 328, 330. But, in order to work a postponement of the operation of the statute, the act of concealment must be a concealment of the fact that the plaintiff has a cause of action. In the light of the record as now presented and the findings of fact made by the court below, was there any such act of concealment? Did the designation "Deferred Charges" really mislead, or was it rendered innocuous by other information then in plaintiff's possession?

At a meeting of the directors of the company on July 15, 1925, a committee was appointed to defend the interests of the company in the Delaware suit, with power to employ counsel; Henderson, who was then a director, was present at this meeting. In 1926 a letter from the president to the stockholders informed the latter that this committee had retained counsel to represent the company; plaintiff admits that she received and read this letter and that she was "concerned with the fact that the company was hiring lawyers and spending money at that time." At a stockholders' meeting held on May 15, 1928, a resolution was passed approving the action of the board in employing counsel on behalf of the company, and directing "that all just and necessary expenses and counsel fees incurred in making such defense on behalf of this company be paid out of the funds thereof." Plaintiff was represented at that meeting by a proxy, who then and there gave notice that the shareholders represented by him regarded the payment for the purpose mentioned in the resolution as illegal and that it would be resisted by lawsuit if necessary. At a meeting of the stockholders held on May 19, 1931, at which plaintiff was again represented by proxy, an attorney representing other shareholders protested the payments which had been made on the ground that they were for claims not legally payable out of the funds of the company. It further appears that although, as already stated, the consolidated balance sheets contained in the

annual reports of the corporation submitted each year to the stockholders included these payments in the column of assets under the designation "Deferred Charges," the report for 1928 contained an explanatory statement that "Included in deferred charges is an item of $636,-052.57 covering cost of litigation between W. M. Henderson et al. and the Plymouth Oil Co. et al. Final disposition of this suit was made February 10, 1928, by the Supreme Court of Delaware"; the report for 1929 contained the statement: "Deferred charges include $833,-146.36 covering cost of litigation. Final disposition of this suit was made February 10, 1928, by the Supreme Court of the State of Delaware"; the report for 1930 contained the statement: "Deferred charges include $833,-146.36 heretofore expended in connection with litigation concluded in a period prior to this audit"; and this notation was also contained in each of the succeeding annual reports to 1937 inclusive. From all this it is abundantly clear that the fact that such payments were made was never concealed from the stockholders, and plaintiff herself testified to the fact—which, of course, did not appear when the case was before this court on demurrer—that she read these reports as they were issued and consequently knew that the money had been paid out by the company for the purpose indicated; she possessed this knowledge more than seven years before the filing of the present bill. Upon what, then, does plaintiff rely to excuse her inaction? Solely upon the carrying of these items as "Deferred Charges" in the asset column of the balance sheets. This, she asserts, was a fraudulent act which misled her into believing that the payments were recoverable, or collectible, that is, that they had not been irretrievably expended by the company,—that they were amounts due the corporation. But the essential question with which plaintiff and the other stockholders were confronted was not whether the payments constituted an asset which the company was entitled to recover, but whether the directors would proceed to effect such

recovery. Did plaintiff have any illusion, by reason of the carrying of this item as an asset, that the directors intended to assert the rights of the corporation and enforce restitution? On the contrary, she testified not only that she knew it would be useless to ask them to remedy the wrong because the granting of such relief would be adverse to the personal interests of a majority of the board, but that she had known this ever since 1929 when the last payment was made by the company,—not merely, therefore, since 1938 when the item was charged against surplus.[5] In order to have the effect of tolling the statute of limitations the act of concealment or deception relied upon must not only be capable of deceiving but must in fact deceive. Since plaintiff was fully informed from the beginning that the company's funds were being expended, had protested against such payments through her representative as being illegal, had threatened litigation to resist them if made, and knew, as she admits, that the directors would not take any steps to effect recovery for the corporation, the operation of the statute was not postponed, and she was bound, if she intended derivatively to assert the rights of the company by asking on its behalf for an accounting, to do so within the six years prescribed by the Act of 1867 or by the general statute adopted in such case by a court of equity. Having failed to proceed within that time, the present action is barred, whatever otherwise may be its merits, as to which no opinion is here expressed.

Decree affirmed; costs to be paid by Plymouth Oil Company.

---

[5] A witness called by plaintiff, the attorney who protested the payments at the stockholders' meeting of May 19, 1931, admitted that there was no indication there of any intention to collect the money from the individual defendants.